**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| BARBARA SHAFRANSKI,<br>Plaintiff,<br>v.<br>NEWREZ, LLC *et al.*,<br>Defendants. | Civil Action No. 23-00901 (GC) (TJB)<br>**OPINION** |

**CASTNER, District Judge**

**THIS MATTER** comes before the Court upon Plaintiff Barbara Shafranski's Motion for Summary Judgment under Federal Rule of Civil Procedure (Rule) 56. (ECF No. 52.) Defendants Newrez LLC d/b/a Shellpoint Mortgage Servicing and Avenue 365 Lending Services, LLC opposed, and Plaintiff replied. (ECF Nos. 55, 56.) The Court has carefully reviewed the parties' submissions and decides the matter without oral argument pursuant to Rule 78(b) and Local Civil Rule 78.1(b). For the reasons set forth below, and other good cause shown, Plaintiff's Motion for Summary Judgment is **GRANTED in part** and **DENIED in part**.

## I. BACKGROUND

### A. Factual Background[1]

Plaintiff is a retired widow who resides at 18 F Street in Seaside Park, New Jersey. (ECF No. 52-2 ¶ 1; ECF No. 55-1 ¶ 1.) Plaintiff has owned that property since 2002, and it became her

---

[1] On a motion for summary judgment, the Court "draw[s] all reasonable inferences from the underlying facts in the light most favorable to the nonmoving party." *Jaffal v. Dir. Newark N.J. Field Off. Immigr. & Customs Enf't*, 23 F.4th 275, 281 (3d Cir. 2022) (citation modified). The factual circumstances surrounding this action, as revealed through discovery, are set forth in the parties' submissions in accordance with Local Civil Rule 56.1. Plaintiff's Statement of Material

primary residence in 2018 after she moved from Louisiana. (ECF No. 52-4 at 8.)[2] This matter concerns whether the parties entered into a contract to refinance Plaintiff's mortgage on the Seaside Park property or whether the original mortgage still governs.

### *1. Before the Refinancing Closing*

Plaintiff testified that, in late 2021, she received a notice from Defendant Newrez, the mortgagee on the Seaside Park property,[3] advertising that mortgage rates were down and that she would qualify for a better interest rate if she refinanced her mortgage, which had an outstanding balance of $156,464.81 and a monthly payment obligation of $1,581.45. (ECF No. 52-2 ¶ 2; ECF No. 52-5 at 33, 48; ECF No. 52-6 at 107, 135; ECF No. 55-1 ¶ 2.) After receiving the advertisement, Plaintiff called Newrez to inquire about the refinancing, and Newrez loan officer Paul Sprague thereafter contacted Plaintiff and presented her with a worksheet that outlined the new interest rate and refinancing costs. (ECF No. 52-2 ¶ 3; ECF No. 52-5 at 36; ECF No. 55-1 ¶ 3.)

Plaintiff then applied to refinance her mortgage. (ECF No. 52-2 ¶ 4; ECF No. 55-1 ¶ 4.) On February 4, 2022, after Newrez approved the application, it sent a Closing Disclosure document to Plaintiff which outlined the terms of the refinanced mortgage. (ECF No. 52-2 ¶ 6; ECF No. 55-1 ¶ 6.) Specifically, the Closing Disclosure outlined that Newrez would loan $160,200.00; the

---

Facts Not in Dispute is at ECF No. 52-2, Defendants' Responsive and Supplemental Statement of Material Facts to Plaintiff's Statement of Material Facts Not in Dispute is at ECF No. 55-1, and Plaintiff's Response to Defendants' Statement of Undisputed Material Facts is at ECF No. 58. Unless otherwise noted, the relevant facts are undisputed or supported by record evidence.

[2] Page numbers for record cites (*i.e.*, "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

[3] Plaintiff lists Newrez and Shellpoint Mortgage Servicing as separate Defendants, but the two are not separate entities, (*see, e.g.*, ECF No. 52-5 at 31), so the Court treats them as a single Defendant and refers to them jointly as Newrez.

interest rate would be 2.375%; the monthly payment obligation would be $1,124.55; the closing costs would be $3,572.61, and the first payment date would be due April 1, 2022. (ECF No. 52-2 ¶ 7; ECF No. 52-7 at 16; ECF No. 52-8 at 51; ECF No. 55-1 ¶ 7.) Newrez recommended to Plaintiff that Defendant Avenue 365 serve as the title company and closing agent. (ECF No. 52-2 ¶ 8; ECF No. 55-1 ¶ 8.) Newrez and Avenue 265 are corporate affiliates with the same parent entity. (ECF No. 52-2 ¶ 8; ECF No. 55-1 ¶ 8.)[4]

### *2. The Closing*

The closing of the refinancing occurred on February 8, 2022, and it took place at the Seaside Park property. (ECF No. 52-2 ¶ 9; ECF No. 55-1 ¶ 9.) The only individuals at the closing were Plaintiff and a notary from the organization Notary Go. (ECF No. 52-4 at 19; ECF No. 52-5 at 14.) Avenue 365 arranged for the notary's presence. (ECF No. 52-4 at 20; ECF No. 52-5 at 14.) Plaintiff testified that the only document she received before closing was the Closing Disclosure. (ECF No. 52-4 at 20, 28.) When reviewing the documents at the closing, Plaintiff found numerous errors that she felt needed to be corrected. (ECF No. 52-2 ¶ 11; ECF No. 55-1 ¶ 11.) Those issues included "charges for property taxes and flood insurance escrow, unmarked empty pages, incorrect recitations that [Plaintiff] had not improved the [Seaside Park property] nor were the adjacent properties improved, errors in the Affidavit of Title, and unidentified missing pages." (ECF No. 52-2 ¶ 11; ECF No. 55-1 ¶ 11.) Plaintiff called Newrez and Avenue 365 representatives about the issues and corrected the documents with hand-written edits. (*See, e.g.*, ECF No. 52-4 at 22.) Plaintiff was then presented with, and signed, two "Borrower Compliance

---

[4] Plaintiff, relying on her own testimony, maintains she did not know about this affiliation when she received Newrez' recommendation. (ECF No. 52-2 ¶ 8; ECF No. 52-4 at 18.) Newrez, however, submits that Plaintiff was aware of the relationship because she signed a disclosure statement on the date the financing closed, and that statement outlined that Newrez "has a business relationship with" Avenue 365. (ECF No. 55-1 ¶ 8; ECF No. 52-6 at 96-97.)

Agreements," which the parties agree required Plaintiff to "cooperate with any requests" by Newrez or Avenue 365 "to correct errors affecting marketability and/or securitization of the [l]oan." (ECF No. 52-2 ¶ 12; ECF No. 52-6 at 74, 120; ECF No. 55-1 ¶ 12.)

However, in part because of the initial errors in the closing documents, Plaintiff decided not to execute two Powers of Attorney that would have given Newrez (as the lender) and Avenue 365 (as the title company) the rights to make certain unilateral changes to the closing documents without first consulting Plaintiff. (ECF No. 52-2 ¶ 13; ECF No. 55-1 ¶ 13.) The Powers of Attorney would have provided Defendants with the ability to "correct and/or execute or initial all typographical or clerical errors discovered in any or all of the closing documentation" but they would not have permitted Defendants to increase the interest rate, the terms of the loan, the outstanding principal balance, or the monthly principal and interest payments without Plaintiff's consent. (ECF No. 52-6 at 77, 113-114.)[5]

Plaintiff testified that, on the day of the closing, she discussed her reluctance to sign the Powers of Attorney with Krisin McGovern, Avenue 365's Post Closing Manager. (ECF No. 52-2 ¶ 14; ECF No. 52-4 at 32; ECF No. 55-1 ¶ 14; ECF No. 55-6 at 8.) And—according to Plaintiff—McGovern told Plaintiff that the loan could close without signing the Powers of Attorney. (ECF No. 52-4 at 33.) Newrez's corporate designee, Shannon Foster, testified that "[i]t appears that Avenue 365 gave [Plaintiff the] authority" for the loan to close without signing the Powers of Attorney, but Foster never received direct confirmation from McGovern that the Powers of Attorney "did not have to be signed." (ECF No. 52-5 at 5, 47, 59.) Foster also testified that when reviewing the loan file, she saw that it "said that [the notary] spoke to someone who did say that

---

5 The unexecuted Powers of Attorney would have applied for 120 days from the date of closing. (*See* ECF No. 52-6 at 77.)

the loan could fund without the [Powers of Attorney,]" but the notary "did not confirm . . . if [the notary] actually spoke to Newrez." (*Id.* at 21.) Plaintiff also testified that, at the end of the closing, she spoke with Newrez' representative, Sprague, on the phone and told him about the issues that came up during the closing, including the Powers of Attorney issue and that McGovern told her it was permissible to not sign those documents. (ECF No. 52-4 at 32-33.) Plaintiff testified that the notary heard the conversation between Plaintiff and McGovern but did not make any remarks about it and moved forward with the closing. (*Id.* at 35.) The Court has not been presented with deposition testimony from Sprague, McGovern, or the notary. At the end of the closing, the notary left and brought all the documents with her. (*Id.*)

### *3. After the Closing*

Six days after the Closing, on February 14, 2022, at 9:31 a.m., Plaintiff received an email from notify@newrez.com stating "[y]our loan has been funded!" (ECF No. 52-7 at 12; ECF No. 52-8 at 37.)[6] The notification was in reference to a loan number ending in 2336, which Foster acknowledged referred to the new, refinanced loan that Plaintiff intended to close on February 8. (ECF No. 52-5 at 29.) Foster testified that, between the closing on February 8 and the email on February 14, she believed internal emails were sent between Newrez and Avenue 365 employees instructing Newrez not to fund the loan, but no email was sent to Plaintiff. (*Id.* at 28-30.) Thus, from Plaintiff's perspective, the refinancing closed on February 8, and the new loan was funded on February 14. (*Id.*)

Internal emails from Avenue 365 were sent at approximately the same time as Plaintiff was notified that her loan had been funded. On February 14, 2022, at 9:20 a.m.—before Plaintiff

6 There is always a gap between the closing and funding dates in mortgage refinancings because lenders are entitled to a three-day cancellation period, not including holidays and weekends. (*See* ECF No. 52-5 at 11.)

received notice that her loan was funded—an Avenue 365 representative named Joshua Tosco[7] emailed a Notary Go representative involved in the closing, Raul Peña, and requested that Peña ensure that the Powers of Attorney be signed because they "are critical to the closing." (ECF No. 52-7 at 10.) At 9:43 a.m. that same day—after Plaintiff received the notice—Peña replied to Tosco that he would reach out to Plaintiff's agent to have the documents signed. (*Id.*) The agent told Peña that Newrez "was well aware that [Plaintiff] refused to sign [the Powers of Attorney] and [Newrez] said it was fine." (*Id.* at 9-10.) Peña relayed this message to Tosco on the morning of February 15 and wrote that Newrez would need to pay Notary Go more money if a notary had to return to re-notarize the closing. (*Id.*) Tosco replied: "Please have [the agent] advise on who[m] from Newrez [the agent] called that informed them of this . . . as it is a point of concern for us if we are giving out incorrect information." (*Id.* at 6-7.) Apart from McGovern, who is an Avenue 365 employee, it was never determined which, if any, Newrez employee allegedly gave this advice. (*See* ECF No. 52-5 at 40.)

On February 17, 2022, Newrez sent Plaintiff a welcome letter indicating that it would be servicing her loan and providing payment instructions. (ECF No. 52-7 at 14.)[8] However, Plaintiff testified that she contacted Newrez or Avenue 365 on or just after February 22, 2022 to obtain copies of the closing documents, but she was informed for the first time by a Newrez representative named James Donohue that the loan was not funded. (ECF No. 52-4 at 21, 37-38.) According to Plaintiff, Donohue stated he would look into why it was not funded, and after the call, he emailed Plaintiff the closing documents. (*Id.* at 38.) Plaintiff also testified that after she made this call,

---

7 According to Foster, Tosco was tasked with "reviewing the final closing documents for funding." (ECF No. 52-5 at 38.)

8 An annotation on the letter indicates it was "received" on February 25, 2022. (*See* ECF No. 52-7 at 14.)

she received a voicemail from McGovern stating there had been a miscommunication at the closing. (*Id.* at 34-35.) Plaintiff stated that McGovern memorialized this voicemail in an email, (*id.* at 35), but neither the voicemail nor the email is in the record before the Court.

After receiving the voicemail and speaking on the phone, Plaintiff and McGovern emailed back and forth. (*See* ECF No. 55-6 at 2-10.) On February 24, 2022, McGovern emailed Plaintiff a set of documents to fill out. (*Id.* at 8.) Plaintiff replied to that email on March 7, 2022 and attached the executed and notarized Powers of Attorney in addition to other documents. (*Id.*) Plaintiff also asked for confirmation that her existing loan prior to the refinancing had been satisfied. (*Id.*) Plaintiff testified that she signed the Powers of Attorney this time around because McGovern apologized for her miscommunication and informed Plaintiff that Newrez would not fund the loan without Plaintiff signing the documents. (ECF No. 52-4 at 40.)[9]

On March 11, 2022, McGovern emailed Plaintiff a revised Closing Disclosure and asked for Plaintiff's approval, and the parties spoke over the phone. (ECF No. 55-6 at 2.) On March 14, 2022, Plaintiff replied to McGovern's email and stated that she did not approve of the revised Closing Disclosure because it indicated the refinancing closing took place in March 2022 rather than on February 8, 2022. (*Id.*) Plaintiff also wrote that she was withdrawing her signature from the Powers of Attorneys because she signed them under duress. (*Id.*)

---

[9] Internally, however, Newrez and Avenue 365 employees were debating whether to forego the Powers of Attorney requirement. On March 7, 2022, a Newrez representative named Arleen Lemmon emailed other Newrez and Avenue 365 employees. (ECF No. 52-7 at 11.) In that email, because the Powers of Attorney dispute resulted in "a huge issue" over whether the loan could be funded, Lemmon wrote: "let's waive the signature of the form, as [Plaintiff] did sign the [Borrower Compliance Agreements]." (*Id.*) But other employees indicated that the signature would still be required. (ECF No. 52-5 at 44-45.) The record is not clear about what, if anything, came from this internal disagreement.

On March 15, 2022, Newrez employee Michael Boland emailed Plaintiff that Newrez could fund the loan based on the February 8 terms if Plaintiff signed the revised Closing Disclosure. (ECF No. 52-4 at 47-48.) Plaintiff replied that this was suitable to her, and Boland sent revised documents, with the only difference being that the daily interest changed "to match up with the correct disbursement date, which is [March 17, 2022.]" (*Id.* at 48.) Plaintiff objected because she wanted all the terms to match up to the February 8, 2022 terms. (*Id.*) Plaintiff made this objection despite the fact that Newrez was "proposing to credit [Plaintiff] the interest so that [she] wouldn't have to pay it." (*Id.*) In other words, Plaintiff was not concerned about whether she was receiving a deal that was "as good" as her previous mortgagee but instead was concerned that "it wasn't the deal [she] had originally contracted with Newrez for." (*Id.*) Newrez sent Plaintiff a new offer on March 18, which included a Powers of Attorney requirement, (ECF No. 55-4 at 26), but the parties were never able to come to a subsequent agreement, (*see* ECF No. 55 ¶¶ 33-34; ECF No. 58 ¶¶ 33-34).

Subsequently, Plaintiff made some payments that were consistent with the refinanced loan ($1,124.55 per month) and some payments that were consistent with the pre-existing loan ($1,581.45 per month), though the record is not clear about how many of each were paid. According to a letter sent by Plaintiff's counsel, Plaintiff paid for both mortgages in March and April of 2022. (ECF No. 1-16 at 2.)[10] Wells Fargo receipts indicate that Plaintiff made payments consistent with the refinanced loan beginning on April 11, 2022. (ECF No. 52-7 at 22.)[11]

---

[10] The Court has not been presented with a citation to bank statements reflecting these double payments. Further, the reduced payments were not scheduled to begin until April 1, 2022, (ECF No. 52-7 at 16), so it is unclear why Plaintiff would have paid for both mortgages in March 2022.

[11] Defendants' counsel sent a letter to Plaintiff stating that an "April 13, 2022" payment was received and that the payment went towards Plaintiff's April 1, 2022 obligation. (ECF No. 55-4 at 25.)

However, Foster testified that these smaller payments started coming in June, July, or August of 2022. (ECF No. 52-5 at 32, 48.) But because in Newrez' view the pre-existing loan was still operative, and the payments being made consistent with the refinanced loan were less than the payments due under the original mortgage, Newrez held those lesser payments "in a suspense account until enough was received to make a full payment." (*Id.* at 32.) According to Foster, Plaintiff was instructed to make the full payments consistent with the original mortgage rather than the lesser payments of the refinanced mortgage, though it is not clear from the record when or in what medium Plaintiff received these instructions. (*Id.* at 32-33.)

On May 5, 2022, Plaintiff sent a letter to Newrez requesting that the refinanced mortgage should be reinstated, the original mortgage should be released, and Newrez should pay Plaintiff for all overcharges assessed against her account. (ECF No. 1-16 at 3.) Newrez' Customer Advocacy Team replied to this letter on May 24, 2022. (*See* ECF No. 55-4 at 25.) It wrote that the only active mortgage was the original one and that Plaintiff failed to make her May 1, 2022 payment in connection with that mortgage but that, as a "courtesy," Newrez would accept the payments without late fees if she paid by June 30, 2022. (*Id.*) Newrez clarified in that reply that, in its view, the February 8 closing was "incomplete" and "not an executed transaction" due to the Powers of Attorney issue. (*Id.*)

On June 15, 2022, Newrez sent Plaintiff a Notice of Intention to Foreclose indicating that, while she made her March and April payments, there were outstanding payments for May and June, each in the amount of $1,581.45. (ECF No. 52-5 at 48; ECF No. 52-7 at 33.)[12] On July 20, 2022, Plaintiff sent a letter to Newrez in response to the foreclosure notice. (ECF No. 52-8 at 88-

---

[12] The outstanding payments were for the full amount of the previous loan despite Foster's testimony that Newrez accepted the payments that were consistent with the refinanced loan. (ECF No. 52-5 at 32, 48.)

89; ECF No. 52-5 at 49.) Plaintiff wrote that foreclosure would be inappropriate because Plaintiff had tendered all payments towards what Plaintiff viewed was the operative mortgage, and in the letter, Plaintiff also set forth what she described as a "Qualified Written Request" for certain documents. (ECF No. 52-8 at 89.) Foster testified that between June 15, 2022 and August 15, 2022, Plaintiff made partial payments—partial because they were in the lesser amount due for the refinanced loan rather than the original loan—but, according to Foster, those partial payments "were eventually applied to the loan as a full payment." (ECF No. 52-5 at 50.)

On August 15, 2022, Newrez sent a second Notice of Intention to Foreclose, outlining that Plaintiff had outstanding balances for July and August, each in the amount of $1,581.45. (ECF No. 52-7 at 38.) Newrez also quoted a late fee of $158.14 but subtracted an unapplied balance of $210.75. (*Id.*) It is not clear where the unapplied balance came from. On September 21, 2022, Plaintiff sent a letter requesting a response to the July 20, 2022 letter. (ECF No. 52-5 at 50; ECF No. 52-8 at 94.) Newrez did not respond, but on January 5, 2023, it sent a third Notice of Intention to Foreclosure due to outstanding payments from October through January, each in the amount of $1,581.45, plus late fees. (ECF No. 52-5 at 50-51; ECF No. 52-7 at 43.)[13] Despite sending the three notices, Newrez never took further action to foreclose. (ECF No. 52-5 at 51.) However, Plaintiff testified that because Newrez has refused to honor the refinanced loan, Newrez has subjected Plaintiff to "derogatory credit reporting," which in turn has resulted in Plaintiff being turned down from credit cards and prohibited from borrowing money to pay off other properties. (ECF No. 52-2 ¶ 30; ECF No. 52-4 at 53; ECF No. 55-1 ¶ 30.)

[13] The record is not clear regarding why Plaintiff's September 2022 obligations were not the subject of a foreclosure notice. (*See* ECF No. 52-5 at 51.)

On January 25, 2023, Plaintiff's counsel sent a letter to Newrez indicating that, among other issues, (1) Newrez violated the Real Estate Settlement Procedures Act (RESPA) by failing to respond to the July 20, 2022 Qualified Written Request, and (2) violated the Fair Debt Collection Practices Act (FDCPA) by misstating the sums Plaintiff owned under her mortgage. (ECF No. 52-8 at 105.) Plaintiff's counsel indicated that if Newrez did not respond to the letter it would commence legal action. (*Id.* at 106.)[14] This litigation ensued.

**B. Procedural Background**

On February 16, 2023, Plaintiff filed a seven-count Complaint in this Court. (ECF No. 1.) Plaintiff asserts claims for breach of contract against Newrez (Count One), violations of the New Jersey Consumer Fraud Act (CFA) (Count Two) and the RESPA (Counts Three, Four, Five, and Six), against both Defendants, and a violation of the FDCPA (Count Seven) against Newrez. (*Id.* at 8-21.)[15] Plaintiff seeks damages, costs, and attorneys' fees. (*Id.* at 21.)

On June 19, 2024, Plaintiff filed a Motion for Leave to File an Amended Complaint because she sought to add a claim under the Fair Credit Reporting Act (FCRA). (*See* ECF No. 27.) On January 31, 2025, the Honorable Tonianne J. Bongiovanni, U.S.M.J., denied that request for failure to state an FCRA claim. (*See* ECF No. 32.) On March 5, 2026, following discovery and several settlement conferences, Plaintiff filed the instant Motion for Summary Judgment. (ECF No. 52.) That Motion is fully briefed and pending before the Court.

---

[14] On March 1, 2023, Newrez responded to Plaintiff's January 25, 2023 letter and wrote that (1) it never received the July 20, 2022 letter and (2) Plaintiff owed $7,293.45 in connection with her loan from October 1, 2022 through February 27, 2023, with previous payments satisfied through applying the smaller refinancing amount to the larger pre-refinancing amount. (ECF No. 55-4 at 19-20.) Newrez allegedly never received the July 20, 2022 letter despite having received the September 21, 2022 letter which was sent to the same address. (*See* ECF No. 52-5 at 55.)

[15] The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and § 1367.

## II. LEGAL STANDARD

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* When deciding the existence of a genuine dispute of material fact, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. "[I]nferences, doubts, and issues of credibility should be resolved against the moving party." *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n.2 (3d Cir. 1983). The Court must grant summary judgment against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "In the face of a properly supported summary judgment motion, the nonmovant's burden is rigorous: the party 'must point to concrete evidence in the record'—mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment." *Roofer's Pension Fund v. Papa*, 687 F. Supp. 3d 604, 616 (D.N.J. 2023) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 484 (3d Cir. 1995)).

## III. DISCUSSION

### A. Breach of Contract (Count One)

To prevail on a claim for breach of contract in New Jersey, a plaintiff has the burden to prove four elements: "first, that the parties entered into a contract containing certain terms; second, that plaintiffs did what the contract required them to do; third, that defendants did not do what the

contract required them to do, defined as a breach of the contract; and fourth, that defendants' breach, or failure to do what the contract required, caused a loss to the plaintiffs." *Goldfarb v. Solimine*, 245 A.3d 570, 577 (N.J. 2021) (citation modified). The parties dispute the first and fourth elements: whether they entered into a contract to refinance the mortgage and whether Plaintiff has proven damages. (ECF No. 52-1 at 12-16; ECF No. 55 at 11-16.) For the reasons described below, the Court will award summary judgment to Plaintiff on her breach of contract claim.

To satisfy the first element, the existence of a contract with certain terms, a plaintiff must prove "offer, acceptance, [and] consideration[.]" *Shelton v. Restaurant.com, Inc.*, 70 A.3d 544, 556 (N.J. 2013). To determine whether there is an offer and acceptance, there must be a "meeting of the minds." *Hagrish v. Olson*, 603 A.2d 108, 110 (N.J. Super. Ct. App. Div. 1992). In New Jersey, when a court assesses whether there is such a meeting, "[a] contracting party is bound by the apparent intention he or she outwardly manifests to the other party. It is immaterial that he or she has a different, secret intention from that outwardly manifested." *Brawer v. Brawer*, 747 A.2d 790, 796 (N.J. Super. Ct. App. Div. 2000) (quoting *Hagrish*, 603 A.2d at 110).

Here, the Court holds that the parties entered into a contract to refinance the mortgage. It is undisputed that Plaintiff submitted an application based on the refinancing numbers outlined in the Closing Disclosure document on February 8, 2022, and Newrez provided confirmation that the refinancing was approved on both February 14, 2022 and February 17, 2022. (ECF No. 52-2 ¶¶ 6, 9, 17-18; ECF No. 52-7 at 12, 14; ECF No. 55-1 ¶¶ 6, 9, 17-18.) These actions constitute the requisite offer and acceptance needed to form a contract. *Shelton*, 70 A.3d at 556.

The parties debate whether Plaintiff's own testimony regarding McGovern's alleged waiver of the Powers of Attorney requirement is sufficient to support the existence of a contract,

(ECF No. 55 at 11-12; ECF No. 56 at 6-8), but this debate is irrelevant for purposes of ruling on Plaintiff's breach of contract claim. Even if the Court were to cast aside that evidence,[16] the record demonstrates that Plaintiff completed a series of documents to effectuate the terms of the refinancing, as outlined in the Closing Disclosure, and Newrez approved the refinancing. The Court has not been presented with any legal requirement that New Jersey mandates borrowers to sign Powers of Attorney before a mortgage refinancing could be deemed effectuated, nor has the Court been presented with any document presented to Plaintiff at the closing indicating that signing the Powers of Attorney was non-negotiable.

And it is irrelevant that Defendants were internally debating whether the Powers of Attorney were necessary, (ECF No. 52-5 at 28-30; ECF No. 52-7 at 6-10), because "[a] contracting party is bound by the apparent intention he or she outwardly manifests to the other party," *Brawer*, 747 A.2d at 796. Newrez' "secret intention" that differed from its "outward manifest[ation]" is immaterial." *Id.* Indeed, the need for Plaintiff to sign the Powers of Attorney was not outwardly manifested until at least February 22, 2026, (ECF No. 52-4 at 21, 35, 38), which was several days after the parties consummated the refinancing. Therefore, when Newrez sent confirmation that

---

[16] While McGovern's waiver is not dispositive on the matter, the Court finds Defendants' argument—that Plaintiff's "self-serving . . . testimony" is insufficient evidence of that waiver (ECF No. 55 at 11)—unconvincing. A movant's testimony, on its own, is sufficient to establish a fact necessary for a claim if it is unrefuted by other evidence in the record. *See Newsome v. City of Newark*, 279 F. Supp. 3d 515, 526 (D.N.J. 2017 ("The [c]ourt accepts [the movant's] version of the warrant application as true. There is no evidence in the summary judgment record to contract [the movant's] testimony."); *Bellis v. N.Y.C. Dep't. of Educ.*, Civ. No. 21-3282, 2024 WL 1177232, at *2 (S.D.N.Y. Mar. 19, 2024) ("[The non-movant's] assertion that 'self-serving' deposition testimony is not competent evidence to establish a fact for purposes of a summary judgment motion is plainly wrong. Indeed, a party . . . can secure summary judgment in his favor if his deposition testimony supports summary judgment and is unrebutted by other evidence." (citation modified) (quoting *Maher v. City of New York*, Civ. No. 09-2679, 2011 WL 7025807, at *5 n.6 (E.D.N.Y. Jan. 10, 2011), *report and recommendation adopted*, 2012 WL 113559 (E.D.N.Y. Jan. 13, 2012)).

Plaintiff's loan was approved on February 14, 2022, the parties entered into a refinancing contract as of that date.[17]

The remaining issue is whether Plaintiff has proven damages.[18] First, the parties dispute whether Plaintiff's unsworn expert report from Professor Todd Sinai regarding damages is admissible. (ECF No. 52-1 at 15-16; ECF No. 52-10 at 1-6; ECF No. 55 at 13.) However, the report only outlines the difference between what Plaintiff would pay under the original loan versus the refinanced loan over the life of those loans. (ECF No. 52-10 at 1-6.) The Court fails to see how this report is relevant to the damages that Plaintiff has suffered as a result of Newrez' breach of contract.[19] In any event, the Court finds that Sinai's unsworn report is inadmissible. *See Snead v. Casino*, 700 F. Supp. 3d 203, 215 (D.N.J. 2023) ("Unsworn expert reports are inadmissible on a summary judgment motion." (collecting cases)).

---

[17] The parties do not debate whether there was proper consideration to enter into the contract. (*See generally* ECF Nos. 52-1, 55.) At a minimum, Plaintiff has established consideration through the closing costs she paid to execute the refinancing. (*See* ECF No. 52-2 ¶ 7; ECF No. 55-1 ¶ 7.) And the Court does not find that recission based on the doctrine of unilateral mistake is warranted. In New Jersey, this doctrine is an equitable affirmative defense, *see* New Jersey Civil Model Jury Charge 4.10N (citing *Massari v. Einsiedler*, 78 A.2d 572, 576 (N.J. 1951)), but Defendants have not pled this defense, nor do they raise it in their briefing, (*see* ECF No. 12 at 18-21; ECF No. 55 at 11-15), so they have waived it, *Charpentier v. Godsil*, 937 F.2d 859, 863 (3d Cir. 1991).

[18] As for the second and third breach of contract elements, the parties do not dispute whether Plaintiff fulfilled her obligations under the refinancing or whether Newrez failed to fulfill its obligations. (*See generally* ECF Nos. 52-1, 55.) Indeed, Plaintiff paid the mortgage consistent with the terms of the Closing Disclosure, (*see, e.g.*, ECF No. 52-7 at 22-25), but Newrez failed to credit those payments consistent with the Closing Disclosure and instead issued three foreclosure notices, (ECF No. 52-7 at 33-46).

[19] The amounts calculated by Sinai might be relevant had Plaintiff been paying solely the original, higher mortgage amounts even though she was not required to do so, but the record before the Court demonstrates that Plaintiff has been paying the lower, refinanced mortgage amount, with the exception of April 2022 when she might have paid two mortgages. (ECF No. 1-16 at 2; ECF No. 52-7 at 22-32.)

Apart from Sinai's report, Plaintiff has introduced evidence demonstrating that she suffered actual damages flowing from Newrez's breach of contract.[20] Plaintiff testified—and Defendants do not offer evidence to the contrary—that because Newrez has not honored the refinanced loan, it has subjected Plaintiff to "derogatory credit reporting" which has resulted in Plaintiff being turned down from credit cards and prohibited from borrowing money to pay off other properties. (ECF No. 52-2 ¶ 30; ECF No. 52-4 at 53; ECF No. 55-1 ¶ 30.) This is sufficient to establish actual damages resulting from the breach. *Cf. Hutchinson v. Del. Sav. Bank FSB*, 410 F. Supp. 2d 374, 383 (D.N.J. 2006) (stating that, in the RESPA context, "denial of credit because of the reporting of delinquent charges to credit reporting agencies can sustain a claim of actual damages" (citation modified)); *Mead v. Johnson Grp., Inc.*, 615 S.W.2d 685, 688 (Tex. 1981) ("[A]ctual damages for loss of credit or injury to credit reputation in an action for breach of contract may be recovered when there is evidence that loss of credit was a natural, probable, and foreseeable consequence of the defendant's breach.") However, on the current record presented by the parties, the Court is unable to calculate any damages wrought by such "derogatory credit reporting." *See Wolinetz v. Weinstein*, Civ. No. 08-5046, 2019 WL 1615134, at *2 (D.N.J. Apr. 16, 2019) (noting that court ordered supplemental submissions on damages after deciding liability on motions for summary judgment). Accordingly, the Court awards summary judgment on Count One as to liability, with the amount of damages to be determined at a later date.[21]

---

[20] Even if Plaintiff failed to establish actual damages, in New Jersey, "the general rule is that whenever there is a breach of contract . . . the law ordinarily infers that damage ensued, and, in the absence of actual damages, the law vindicates the right by awarding nominal damages." *Nappe v. Anschelewitz, Barr, Ansell & Bonello*, 477 A.2d 1224, 1228 (N.J. 1984) (citation modified).

[21] To the extent Plaintiff paid double mortgages in March and April of 2022, the amount she paid in excess of $1,581.45 for March (the monthly amount before the refinanced mortgage took effect), and $1,124.55 for April (the monthly amount for the refinanced mortgage), would go towards actual damages.

**B. CFA (Count Two)**

Plaintiff argues that both Defendants violated the CFA because "Newrez . . . misrepresented to [Plaintiff] that the loan had funded" and as such, summary judgment must be granted in her favor. (ECF No. 52-1 at 19.) Defendants respond that Plaintiff's claim fails because "she has not proven the lynchpin of the claim: fraud." (ECF No. 55 at 14.) For the reasons described below, the Court agrees with Defendants that Plaintiff has failed to prove a violation of the CFA, so the Court will deny Plaintiff's Motion as to Count Two.

To prevail on a claim under the CFA, a plaintiff must satisfy three elements: "(1) unlawful conduct on the part of the [d]efendant; (2) an ascertainable loss on the part of the [p]laintiff; and (3) a causal relationship between the unlawful conduct and the ascertainable loss." *D'Argenzio v. Bank of Am. Corp.*, 877 F. Supp. 2d 202, 208 (D.N.J. 2012). The CFA defines an unlawful practice as:

> The act, use or employment by any person of any *unconscionable* commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby[.]

N.J. Stat. Ann. § 56:8-2 (emphasis added). These unlawful practices "fall[] into three camps: 'affirmative acts, knowing omissions, and regulation violations[ ].'" *McLaren v. UPS Store, Inc.*, Civ. No. 21-14424, 2025 WL 3238934, at *8 (D.N.J. Nov. 20, 2025) (quoting *Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 462 (N.J. 1994)). Affirmative acts do not require a showing of intent. *Id.* (citing *Cox*, 647 A.2d at 462).

However, affirmative acts do require a showing of unconscionability, even if they are unintentional. *See* N.J. Stat. Ann. § 56:8-2. "The New Jersey Supreme Court has explained that

unconscionability is 'an amorphous concept obviously designed to establish a broad business ethic.'" *Martina v. LA Fitness Intern., LLC*, Civ. No. 12–2063, 2012 WL 3822093, at *2 (D.N.J. Sep. 4, 20212) (quoting *Cox*, 647 A.2d at 462). "What is unconscionable will necessarily be resolved by the courts on a case-by-case basis." *Id.* (citation modified). To be unconscionable, the conduct "must at a minimum imply a 'lack of good faith, honesty in fact and observance of fair dealing and have the capacity to mislead.'" *Rapoport v. Caliber Home Loans, Inc.*, 617 F. Supp. 3d 241, 246 (D.N.J. July 28, 2022) (quoting *Ciser v. Nestle Waters N. Am., Inc.*, 596 F. App'x 157, 160 (3d Cir. 2015); *cf. Ciser*, 596 F. App'x at 157 ("[P]laintiffs may not repurpose a breach of contract claim into an 'unconscionable commercial practice' claim under the CFA[.]").

Here, the Court cannot conclude that, as a matter of law, either Defendant violated the CFA. First, Avenue 365 is not the proper Defendant for this claim. Plaintiff asserts that the unlawful conduct occurred when "Newrez . . . misrepresented to [Plaintiff] that the loan had funded." (ECF No. 52-1 at 19.) The Court understands Plaintiff to be referring to the February 14, 2022 notification and the February 17, 2022 welcome email, which were both sent by Newrez. (*See* ECF No. 52-7 at 12, 14.) However, to violate the CFA, Plaintiff must prove "unlawful conduct on the part of the *[d]efendant*." *D'Argenzio*, 877 F. Supp. 2d at 208 (emphasis added). Because Plaintiff does not assert that Avenue 365 committed this violative conduct, the Court cannot grant summary judgment in Plaintiff's favor as to this Defendant.

The Court is also unable to award summary judgment as against Newrez. To be unconscionable, Newrez's February 14 and 17 communications "must at a minimum imply a 'lack of good faith, honesty in fact and observance of fair dealing and *have the capacity to mislead*.'" *Rapoport*, 617 F. Supp. 3d at 246 (emphasis added) (quoting *Ciser*, 596 F. App'x at 160). The Court cannot conclude that, as a matter of law, the communications could have had the capacity

to mislead. As discussed *supra*, those communications served as Newrez' outward manifestation of intent to agree to the refinancing of the mortgage. Because this Court held that, as a result of those manifestations, a contract existed between Plaintiff and Newrez, those manifestations did not also have the capacity to mislead Plaintiff into thinking the loan was refinanced. In other words, those notifications could not *mislead* Plaintiff into thinking the loan was refinanced, because, as a matter of law, the loan *was* refinanced. *See Rapoport*, 617 F. Supp. 3d at 246; *Cf. Ciser*, 596 F. App'x at 157. Accordingly, the Court must deny Plaintiff's Motion as to Count Two.

**C. RESPA (Counts Three, Four and Five)**

In Counts Three through Five, Plaintiff asserts several violations of the RESPA.[22] Plaintiff contends that Defendants violated 12 U.S.C. § 2605(e)(1) (Count Three), 12 U.S.C. § 2605(e)(2)(c) (Count Four), and 12 U.S.C. § 2605(e)(1)(A) (Count Five) when Newrez ignored Plaintiff's July 20, 2022 request for information. (ECF No. 1 at 10-16; ECF No. 52-1 at 19-21.) Defendants respond that the request was not a "Qualified Written Request" within the meaning of the RESPA and that even if it were, Plaintiff has failed to prove the requisite damages under the statute. (ECF No. 55 at 16-23.)

The RESPA is "a consumer protection statute that regulates the real estate settlement process." *Jones v. ABN Amro Mortg. Grp., Inc.*, 606 F.3d 119, 124 (3d Cir. 2010). Congress enacted the RESPA to "insure that customers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from . . . certain abusive practices." 12 U.S.C. § 2601(a). To prove a RESPA claim, under any of the provisions cited in the Complaint, a plaintiff must establish "(1) the submission of a Qualified

---

[22] Plaintiff brings Counts Three and Four against Newrez and Count Five against both Defendants. (ECF No. 1 at 10-16.)

Written Request by a borrower to a loan servicer for information relating to the servicing of the loan; (2) a failure by the loan servicer to timely respond; and (3) damages." *Howard v. Vill. Cap. & Inv., LLC*, Civ. No. 25-4588, 2026 WL 851245, at *3 (D.N.J. Mar. 27, 2016).

As for the first element, to trigger RESPA obligations, the "Qualified Written Request" must "relat[e] to the servicing of [a] loan," and it must be "a written correspondence . . . that . . . includes, or otherwise enables the servicer to identify, the name and account of the borrower; and . . . includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower." 12 U.S.C. § 2605(e)(1)(A)-(B).

Courts have interpreted the term "relating to the servicing" narrowly. Rather than construing it "to encompass virtually any request for information that might indirectly relate to payments" courts have instead interpreted it to "exclude requests for information that only relate to payments because that information is about the loan generally." *Wallace v. Bank of Am.*, Civ. No. 11-0038, 2011 WL 3859745, at *4 (D.N.J. Aug. 30, 2011). Under this narrow interpretation, when requests "only relate to servicing because they address the validity of the loan or amendment of its terms," such requests are not subject to the RESPA's protections. *Id.*; *see Hager v. CitiMortgage, Inc.*, Civ. No. 16-03348, 2017 WL 751422, at *5 (D.N.J. Feb. 27, 2017) ("Courts in this district to have applied the [Qualified Written Request] definition have consistently found that the term does not include documents relevant only to the origination and validity of the loan."); *Mercado v. Bank of Am., N.A.*, Civ. No. 12-01123, 2013 WL 2933217, at *4 (D.N.J. June 13, 2013) ("[L]etters challenging only a loan's validity or its terms are not qualified written requests that give rise to a duty to respond under § 2605(e)." (alteration in original)). Indeed, as the Ninth Circuit has summarized:

> "Servicing" . . . does not include the transactions and circumstances surrounding a loan's origination—facts that would be relevant to a challenge to the validity of an underlying debt or the terms of a loan agreement. Such events *precede* the servicer's role in receiving the borrower's payments . . . . The statute thus distinguishes between letters that relate to borrowers' disputes regarding servicing, on the one hand, and those regarding the borrower's contractual relationship with the lender, on the other.

*Medrano v. Flagstar Bank, FSB*, 704 F.3d 661, 666-67 (9th Cir. 2012) (emphasis in original).

Here, Plaintiff has failed to demonstrate that, as a matter of law, the July 20, 2022 letter is a Qualified Written Request subject to the RESPA. Plaintiff sent the July 20, 2022 letter in response to receiving a Notice of Intent to Foreclose from Newrez premised on Plaintiff's failure to pay the original loan. (ECF No. 52-8 at 88.) In the letter, Plaintiff wrote that foreclosure would be improper because she tendered all payments in connection with the refinanced loan. (*Id.*) Plaintiff's counsel therefore requested ten documents so that counsel could "advise [Plaintiff] of her rights." (*Id.* at 89.)[23] On September 21, 2022, to address Newrez's alleged "error in the failure to adhere to the closing of [P]laintiff's loan in February of 2022," Plaintiff informed Newrez that it had not complied with the July 20, 2022 requests. (*Id.* at 94.)

As Plaintiff makes clear in these letters, the documents sought in the July 20, 2022 request were made to challenge the validity of the original loan, because in Plaintiff's view, the refinanced loan governed. (*See id.* at 88-89, 94.) However, a request for documents to challenge the validity

---

[23] Those ten documents requested included the: (1) "Correction Agreement/Limited Power of Attorney presented on February 8, 2022"; (2) "February 11, 2022 contact from Avenue 365 to [Plaintiff]"; (3) "February 15, 2022 notification by Avenue 365 to Newrez"; (4) "Confirmation of Newrez that the Power of Attorney must be signed"; (5) "February 24, 2022 contact by Avenue 365 to [Plaintiff]"; (6) "Communications from Kristen McGovern and [Newrez employee] John Artim to [Plaintiff]"; (7) "March 11, 2022 revised closing disclosure"; (8) "March 16, 2022 email from unnamed manager of customer advocacy"; (9) "March 17, 2022 notification re revised closing disclosure"; and (10) "March 18, 2022 updated closing disclosure." (ECF No. 52-8 at 88-89.)

of a loan is not a Qualified Written Request that is subject to the RESPA. *Wallace*, 2011 WL 3859745, at *4; *Hager*, 2017 WL 751422, at *5; *Mercado*, 2013 WL 2933217, at *4; *Medrano*, 704 F.3d at 666-67. Plaintiff does not address these cases in her opening brief, and when presented with them on reply, Plaintiff merely states that she "rests on her argument in her prior [b]rief[.]" (ECF No. 56 at 19 n.12.) This response is insufficient. *See Joyce v. Jaguar Land Rover N. Am., LLC*, 768 F. Supp. 3d 674, 699 (D.N.J. 2025) (denying in part motion when moving party failed to address argument raised in opposition (citing *Beazer E., Inc. v. Mead Corp.*, 412 F.3d 429, 437 n.11 (3d Cir. 2005)). Accordingly, the Court cannot award summary judgment to Plaintiff on her RESPA claims for this independent reason.

Even if Plaintiff's requests were subject to the RESPA, she has still not proven her claims because she had not established damages. "Proof of damages is a crucial component of a RESPA claim." *Straker v. Deutsche Bank Nat'l Tr.*, Civ. No. 09-338, 2012 WL 7829989, at *11 (M.D. Pa. Apr. 26, 2012). Under the RESPA, a plaintiff must prove "one of two types of damages: (1) actual damages to the borrower as a result of the failure to comply with § 2605; or (2) statutory damages in the case of a pattern or practice of noncompliance with the requirements of § 2605." *Giordano v. MGC Mortg.*, 160 F. Supp. 3d 778, 781 (D.N.J. 2016). To establish actual damages, the only type of damages asserted in the instant matter, "the borrower has the responsibility to present specific evidence to establish a causal link between the financing institution's violation and their injuries." *Id.* (citation modified). Courts have found that attorneys' fees are "insufficient to satisfy the actual damages pre-requisite to suit" because "a contrary finding would render the portion of the statute directly addressing 'costs of the action,' superfluous." *Id.* at 783 (collecting cases) (citing 12 U.S.C. § 2605(f)(3)).

Here, the only actual damages Plaintiff asserts in connection with Defendants' failure to respond—as opposed to damages related to the breach of contract—are "[r]easonable attorneys' fees." (ECF No. 52-1 at 20-21.) However, the Court finds this assertion insufficient to establish actual damages. *See Giordano*, 160 F. Supp. 3d at 781. And, just as with Plaintiff's Qualified Written Request deficiency, when presented with the issue by Defendants in opposition, Plaintiff fails to address it in reply and merely stands on her opening brief. (ECF No. 56 at 19 n.12.) Just as before, this is inadequate. *See Joyce*, 768 F. Supp. 3d at 699; *Beazer E.,*412 F.3d at 437 n.11. Accordingly, for this additional reason, the Court cannot award summary judgment on Plaintiff's RESPA claims and must therefore deny Plaintiff's Motion as to Counts Three, Four, and Five.[24]

**D. FDCPA (Count Seven)**

In the final Count, Plaintiff brings a claim against Newrez under the FDCPA for violations of 15 U.S.C. §§ 1692e(2), 1692e(10), and 1692f. (ECF No. 1 at 20-21; ECF No. 52-1 at 21-25.) For the reasons described below, the Court will award $500 in statutory damages to Plaintiff under § 1692e(2) and § 1692e(10), but it will decide appropriate attorneys' fees at a later date upon the receipt of additional submissions.

***1. Liability***

"To prevail on an FDCPA claim, a plaintiff must prove that (1) she is a consumer, (2) the defendant is a debt collector, (3) the defendant's challenged practice involves an attempt to collect a 'debt' as the Act defines it, and (4) the defendant has violated a provision of the FDCPA in attempting to collect the debt." *Douglass v. Convergent Outsourcing*, 765 F.3d 299, 303 (3d Cir. 2014). "The FDCPA is a strict liability statute to the extent it imposes liability without proof of an

[24] Plaintiff asserts a fourth RESPA claim under Count Six, (ECF No. 1 at 16-19), but does not seek summary judgment with respect to that Count, (*see generally* ECF No. 52-1).

intentional violation." *Allen ex rel. Martin v. LaSalle Bank, N.A.*, 629 F.3d 364, 368 (3d Cir. 2011). The FDCPA does allow debt collectors to avoid liability for violations in specific circumstances, but "violations forgivable under § 1692k(c) must result from 'clerical or factual mistakes,' not mistakes of law." *Daubert v. NRA Grp.*, 861 F.3d 382, 394 (3d Cir. 2017) (quoting *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 587 (2010)). For each of the alleged violations, the parties only dispute whether Plaintiff has satisfied the fourth requirement to prove a claim: violation of a provision of the FDCPA. (*See* ECF No. 52-1 at 21-25; ECF No. 55 at 20-23.) The Court accordingly turns to those provisions asserted by Plaintiff.

*a. 15 U.S.C. § 1692e(2) and § 1692e(10)*

Section 1692e(2) prohibits a debt collector from making a "false representation" regarding "the character, amount or legal status of any debt[.]" 15 U.S.C. § 1692e(2). Similarly, section 1692e(10) prohibits "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt[.]" 15 U.S.C. § 1692e(10). Plaintiff contends that through the three Notices of Intention to Foreclose, Newrez "falsely claimed that [Plaintiff] was in default of her original mortgage," and therefore violated both provisions. (ECF No. 52-1 at 22-24.) Defendants respond that Newrez "did not misrepresent anything in its notices of intent to foreclose" given that Plaintiff "indisputably was, and remains, in default on her existing mortgage, because she was not, and is not, making the full payment owed each month ($1,581.45.)" (ECF No. 55 at 22.) Instead, according to Defendants, Plaintiff improperly "made payments in the amount that would have been owed under the refinance terms had the refinance been completed ($1,124.55)." (*Id.*)

However, because Defendants' argument hinges on the theory that the parties did not enter into a contract to refinance the loan, and because the Court has ruled against that legal theory and instead holds that such a contract existed and Newrez breached that contract, *see supra* Section

III.A, Defendants' sole argument is unconvincing. Because the FDCPA is a strict liability statute that does not excuse legal mistakes, the Court finds the foreclosure notices were "false representations" that Plaintiff owed a debt in violation of 15 U.S.C. § 1692e(2) and § 1692e(10). *Allen*, 629 F.3d at 368; *Daubert*, 861 F.3d at 394. The Court accordingly will grant summary judgment to Plaintiff on these portions of the FDCPA claim.

*b. 15 U.S.C. § 1692f*

Section 1692f prohibits a debt collector from using "unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f. Section 1692f "is considered to be a catch-all provision for conduct that is unfair but is not specifically identified in any other section of the FDCPA." *Rush v. Portfolio Recovery Assocs., LLC*, 977 F. Supp. 2d 414, 432 (D.N.J. 2013). Courts have therefore dismissed § 1692f claims when those claims are "premised on the same conduct complained of in [a plaintiff's] other claims under the FDCPA." *Id.*

Here, Plaintiff's Complaint alleges that Newrez violated § 1692f "by attempting to collect amounts not authorized under the applicable loan documents and by threatening to foreclose on [Plaintiff's] home when it had no enforceable right to do so," (ECF No. 1 at 20), and in its briefing it argues Newrez' breach of contract was "grossly unfair and unconscionable," (ECF No. 52-1 at 25). Because these are references to the same conduct that formed the basis of Plaintiff's § 1692e claims, the Court cannot grant summary judgment for Plaintiff on this portion of her FDCPA claim. *Rush*, 977 F. Supp. 2d 414 at 432.[25]

[25] In Plaintiff's briefing, she also asserts that "the false credit reporting which made it impossible [for Plaintiff] to obtain credit" forms a basis for her § 1692f claim. (ECF No. 52-1 at 25.) To the extent this fact is distinct from the facts supporting her § 1692e claims, the Court nonetheless finds it insufficient to award summary judgment on her § 1692f claim. The Court cannot conclude that Newrez engaged in "unfair or unconscionable means" to collect a debt when its collection attempt was simply aligned with its legal theory that the debt was owed. (*Cf.* ECF No. 32 at 13 (Magistrate Judge denying Plaintiff's motion to add claim under FCRA when "a more

### *2. Damages*

"The damages that can be awarded for a violation of the FDCPA include: (1) any actual damages sustained by the consumer as a result of the violation, 15 U.S.C. § 1692k(a)(1); (2) up to $1,000 in additional damages as the court may allow, § 1692k(a)(2)(A); and (3) costs of the action and a reasonable attorney's fee as determined by the court, § 1692k(a)(3)." *Manopla v. Bryant, Hodge & Assocs.*, Civ. No. 13-338, 2014 WL 793555, at *3 (D.N.J. Feb. 26, 2026). "[S]tatutory damages cannot exceed $1,000 per lawsuit per plaintiff, rather than $1,000 per violation." *Id.* at *6 (citing U.S.C. § 1692k(a)(2)(A)). "Whether statutory damages should be granted, and if so, whether the full amount of $1000 should be allowed, is committed to the discretion of the court." *Id.* "In exercising that discretion, courts look to the nature of the violation" and "[i]f the violation is especially egregious, or if plaintiffs show that it was repeated and persistent, courts are more likely to award the full amount." *Id.* (collecting cases awarding $1,000). By contrast, when "the violation is shown to be technical in nature and infrequent, courts have exercised their discretion to deny or reduce statutory damages." *Id.* (collecting cases awarding $0 to $500 in damages when violations were infrequent or unintentional).

Here, Plaintiff seeks only "statutory damages of $1,000 plus attorneys' fees." (ECF No. 52-1 at 25). As for statutory damages, Newrez sent three foreclosure notices, (ECF No. 52-7 at 33-46), but there is no evidence Newrez intentionally violated the FDCPA. Instead, Newrez acted in accordance with its legal theory that it earnestly believed was correct, which is especially clear

thorough and complete investigation would not have altered Newrez's conclusion that Plaintiff failed to make timely monthly payments under the original mortgage" given that the dispute turned on the legal question of "whether the 2022 refinance loan constitutes a binding contract").) *See also Castro v. Geen Tree Servicing LLC,* 959 F. Supp. 2d 698, 711-12 (S.D.N.Y. 2013) (granting summary judgment for plaintiff on § 1692e claim but denying on § 1692f claim because "although [the defendants] . . . may have falsely represented the amount of the debt owed, that does not suggest, as a matter of law, that it constituted 'unfair or unconscionable means'").

given that the matter has progressed to the summary judgment stage. The Court finds $500 is an appropriate award to reflect the unintentional but three times repeated violations. *Manopla*, 2014 WL 793555, at *6.

As for attorneys' fees, "in FDCPA cases, the lodestar method is the appropriate method for awarding fees." *Burrows v. DC Portfolio Servs.*, Civ. No. 22-260, 2025 WL 2304797, at *13 (D.N.J. Aug. 11, 2025) (citation omitted). "The lodestar method is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Manopla*, 2014 WL 793555, at *9 (citation modified). However, "because [Plaintiff] failed to attach an affidavit containing the amount of hours counsel devoted to this action and the hourly rate . . . the Court cannot determine whether [Plaintiff's] request for attorneys' fees and costs is reasonable" at this time. *Stonebridge Bank v. Nita Props., LLC*, Civ. No. 09–5145, 2011 WL 380759, at *7 (D.N.J. Jan. 31, 2011). Accordingly, at this time, the Court only grants statutory damages subject to a supplemental submission by counsel.

## IV. CONCLUSION

For the foregoing reasons, and other good cause shown, Plaintiff's Motion for Summary Judgment (ECF No. 52) is **GRANTED in part** and **DENIED in part**. An appropriate Order follows.

Dated: August 26, 2026

Georgette Castner

GEORGETTE CASTNER
UNITED STATES DISTRICT JUDGE